UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**
4-22-13
APR 22 2013

Judge Edmond E. Chang
United States District Court

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 12 CR 658 |
| vs. | ) | |
| | ) | Judge Edmond E. Chang |
| DAVID TRESCH | ) | |

## PLEA AGREEMENT

1.     This Plea Agreement between the United States Attorney for the Northern District of Illinois, GARY S. SHAPIRO, and defendant DAVID TRESCH, and his attorney, JEFFREY B. STEINBACK, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure and is governed in part by Rule 11(c)(1)(A), as more fully set forth below. The parties to this Agreement have agreed upon the following:

### Charges in This Case

2.     The indictment in this case charges defendant with: having devised and participated in a scheme to defraud and deprive the Victim Firm of the intangible right to the honest services of its employee defendant TRESCH through kickbacks, in violation of Title 18, United States Code, Sections 1341 and 1346 (Counts One through Five); and having devised and participated in a scheme to defraud and deprive the Victim Firm of the intangible right to the honest services of its employee defendant TRESCH through kickbacks, and to defraud and obtain money from the Victim Firm by means of materially false and fraudulent pretenses, representations, and promises, and the concealment of material facts, in violation of Title 18, United States Code, Sections 1341 and 1346 (Counts Six through Ten).

3. Defendant has read the charges against him contained in the indictment, and those charges have been fully explained to him by his attorney.

4. Defendant fully understands the nature and elements of the crimes with which he has been charged.

## Charge to Which Defendant Is Pleading Guilty

5. By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to Count One of the indictment, which charges defendant with having devised and participated in a scheme to defraud and deprive the Victim Firm of the intangible right to the honest services of its employee defendant TRESCH through kickbacks, in violation of Title 18, United States Code, Sections 1341 and 1346. In addition, as further provided below, defendant agrees to the entry of a forfeiture judgment.

## Factual Basis

6. Defendant will plead guilty because he is in fact guilty of the charge contained in Count One of the indictment. In pleading guilty, defendant admits the following facts and that those facts establish his guilt beyond a reasonable doubt, and establish a basis for forfeiture of the property described elsewhere in this Plea Agreement:

Beginning no later than in or around November 2004 and continuing until in or around March 2011, in the Northern District of Illinois, Eastern Division, and elsewhere, defendants DAVID TRESCH and Nicholas Demars knowingly devised and participated in a scheme to

defraud and deprive the Victim Firm of the intangible right to the honest services of its employee TRESCH through kickbacks.

Specifically, in or around May 2004, the Victim Firm, a global law firm headquartered in Chicago, Illinois, hired TRESCH to work as a server operations manager in the Victim Firm's information technology department in Chicago. In the Fall of 2004, the Victim Firm promoted TRESCH to the position of assistant director of global operations. In that position, TRESCH was responsible for server operations and data centers worldwide. In the Fall of 2004, Victim Firm Employee C, the Victim Firm's Director of Global Operations, asked TRESCH if he knew of any consulting companies that could install IT systems and advise Victim Firm employees on how to maintain and troubleshoot certain IT systems. TRESCH told Victim Firm Employee C that NS Mater, an Itasca-based IT firm, could help the Victim Firm. TRESCH knew Demars to be the President of NS Mater, a firm that provided personnel and technology to businesses to assist in office automation, web and database development, and general IT matters. Prior to his employment with the Victim Firm, TRESCH had worked for NS Mater. TRESCH never disclosed his prior employment with NS Mater when recommending it to the Victim Firm.

After speaking to Victim Firm Employee C, TRESCH talked to Demars about the Victim Firm's needs and whether NS Mater could fulfill them. Soon after speaking to Demars, TRESCH provided Demars' contact information to someone at the Victim Firm who was responsible for formalizing the agreement between NS Mater and Victim Firm.

TRESCH was not involved in formalizing the agreement between Mayer Brown and NS Mater. However, TRESCH was in charge of overseeing the work that NS Mater contract employees performed at Mayer Brown. TRESCH understood that NS Mater contract employees were to complete their work by June 2005.

Around the time that NS Mater contract employees began work at the Victim Firm, TRESCH and Demars discussed how to split the profits Demars was earning from NS Mater's work at the Victim Firm. Demars asked TRESCH if there was something Demars could do to ensure that the Victim Firm would continue to send work to NS Mater. Demars suggested that he and TRESCH could split the profits from NS Mater's work with the Victim Firm 60/40, with 60% going to Demars and 40% going to TRESCH. Demars explained that he was deserving of a 60% cut because he was responsible for the overhead expenses associated with running NS Mater. TRESCH agreed to this arrangement and understood that the money Demars would pay him was a kickback, being paid in exchange for work TRESCH had directed and would continue to direct from the Victim Firm to NS Mater. TRESCH explained to Demars that he would need to charge the Victim Firm going-market rates for the work NS Mater contract employees performed in order to avoid drawing suspicion from the firm. TRESCH told Demars the market rates for contract employees.

Demars submitted the invoices for the work NS Mater contract employees performed at the Victim Firm to TRESCH via e-mail at the Victim Firm. TRESCH then submitted the invoices to the Victim Firm for payment. The Victim Firm paid each invoice upon

TRESCH's request. TRESCH understood that the Victim Firm mailed the checks for NS Mater to Demars.

Between late 2003 and July 2005, the Victim Firm paid NS Mater approximately $249,320 for the work NS Mater contract employees performed at the firm. After paying employees and payroll administrators, NS Mater's profits were approximately $110,145. Between February 2005 and July 2005, Demars paid TRESCH approximately $49,900 as TRESCH's share of the profits from the work NS Mater contract employees performed at the Victim Firm. Demars paid TRESCH via checks drawn on the NS Mater account. Sometimes Demars left the checks in the mailbox at TRESCH's home in Itasca. Other times, TRESCH picked up the checks directly from Demars. TRESCH deposited most of the checks into the joint account he shared with his wife at Itasca Bank. TRESCH did not disclose these payments to the Victim Firm.

In late Spring 2005, the Victim Firm embarked on a project to consolidate data centers and to overhaul the Victim Firm's IT infrastructure. The project was expected to take two years starting in 2006, and would require the use of consulting companies and contract employees. TRESCH directed some of the work under the project to NS Mater. By late 2005, TRESCH discussed the scope of the project with Demars. By that time, TRESCH had become concerned that someone at the Victim Firm would discover the kickbacks he had received from Demars, and stood to receive from Demars in the future. As a result, TRESCH told Demars that he wanted the profit split to change from 60/40 to 50/50. TRESCH

explained to Demars that such a split better reflected the risk TRESCH was taking by giving the Victim Firm's business to Demars in exchange for a kickback. Demars agreed. TRESCH also told Demars to begin paying TRESCH's wife TRESCH's share of the kickbacks as if she were a salaried employee of NS Mater, hoping better to conceal TRESCH's role in obtaining illegal kickbacks. Demars agreed. TRESCH gave his wife an IRS form W-4, had her sign it, and then gave the signed form to Demars.

In 2006 and 2007, Demars provided NS Mater contract employees to the Victim Firm to perform work on the Victim Firm's infrastructure project. In 2008, after the completion of the project, TRESCH continued to direct work at the Victim Firm to NS Mater. Between 2008 and early 2011, Demars provided NS Mater contract employees to the Victim Firm to serve as temporary employees in the IT department. In November 2008, the Victim Firm promoted TRESCH to the position of Director of Global Operations. By 2010, Victim Firm Employee B joined the Victim Firm as its Chief Operation Officer. At some point in 2010, Victim Firm Employee B told TRESCH that he wanted the Victim Firm to stop using temporary employees, including NS Mater contract employees, at the firm. In 2010, there were a handful of NS Mater contract employees working at the Victim Firm. Rather than agree to let those employees go, TRESCH sought to justify their work at the Victim Firm and was able to obtain Victim Firm Employee B's approval to allow them to work through February 2011. On February 28, 2011, TRESCH received an e-mail from Victim Firm Employee B telling him that it was the last day of work for the remaining NS Mater contract

employees. Those NS Mater contract employees continued to perform work at the Victim Firm through March 2011.

Between 2006 and March 2011, TRESCH continued to have primary responsibility for overseeing the work that NS Mater contract employees performed for the Victim Firm. Demars submitted the invoices for the work NS Mater contract employees performed at the Victim Firm to TRESCH via e-mail at the Victim Firm. TRESCH was responsible for submitting the invoices to the Victim Firm for payment. TRESCH submitted each invoice for payment, usually without making any changes to the invoices Demars submitted. The Victim Firm paid each invoice upon TRESCH's request. The Victim Firm mailed the checks for NS Mater to Demars. TRESCH never told the Victim Firm that TRESCH accepted kickbacks from Demars for the work that NS Mater performed.

Between 2006 and March 2011, the Victim Firm paid NS Mater approximately $7,416,866 for the work NS Mater contract employees performed at the firm. After paying employees and payroll administrators, NS Mater's profits were approximately $3,597,108. Between 2006 and March 2011, Demars paid TRESCH approximately $1,129,521 – TRESCH's share of the profits of the kickback scheme – via checks made out to TRESCH's wife drawn on the NS Mater account. During that time, TRESCH's wife performed no work for NS Mater or the Victim Firm. Sometimes Demars left the checks for TRESCH in the mailbox outside of TRESCH's home in Itasca. Other times, TRESCH picked up the checks

from Demars directly. TRESCH and his wife deposited the majority of the checks into their joint account at Itasca Bank.

Once he was hired at the Victim Firm, TRESCH understood that he had a duty to provide honest services to the Victim Firm. TRESCH further understood throughout the kicback scheme with Demars that the scheme was a violation of that duty. TRESCH knew that it was material to the Victim Firm to know whether TRESCH accepted kickbacks in exchange for steering work to NS Mater, and TRESCH concealed the kickbacks from the Victim Firm.

On or about March 7, 2008, in the Northern District of Illinois, Eastern Division, TRESCH, for the purpose of executing the scheme to defraud, and attempting to do so, knowingly caused to be delivered by mail according to the direction thereon to NS Mater, PO Box 464, Itasca, IL, 60143, a check dated March 4, 2008, in the amount of $46,698.24 for work that NS Mater contract employees performed at the Victim Firm, in violation of Title 18, United States Code, Sections 1341 and 1346.

7.      Defendant also acknowledges that for the purpose of computing his sentence under the Sentencing Guidelines, the following conduct, to which he stipulates, constitutes relevant conduct under Guideline §1B1.3:

Beginning no later than in or around November 2010 and continuing until on or about June 28, 2012, in the Northern District of Illinois, Eastern Division, and elsewhere, defendants TRESCH and Demars knowingly devised and participated in a scheme to defraud

and deprive the Victim Firm of the intangible right to the honest services of its employee TRESCH through kickbacks, and to defraud and obtain money from the Victim Firm by means of materially false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

Specifically, by late 2010, TRESCH realized that the Victim Firm would soon stop employing NS Mater contract employees. As a result, both Demars and TRESCH would stop receiving money from the profits of the work of those employees. In October or November 2010, TRESCH met with Demars to discuss another way they could continue to make money from the Victim Firm. During the meeting, TRESCH told Demars to submit invoices from NS Mater to the Victim Firm. TRESCH explained to Demars that he would tell Demars what information to put on the invoice, including the work that had been completed, and the amount of money owed to NS Mater for that work. TRESCH told Demars that he should then submit the invoices to TRESCH and that TRESCH would submit them to the Victim Firm for payment. In exchange for his help, TRESCH told Demars that TRESCH would pay him $5,000 for each invoice. TRESCH instructed Demars to write TRESCH a check for the remainder of the paid invoice so that TRESCH could use the money to hire other non-NS Mater contract employees. TRESCH told Demars that those other contract employees would then perform the work Demars had claimed NS Mater contract employees had already performed. TRESCH and Demars ultimately agreed to proceed with TRESCH's idea.

Between November 2010 and early June 2012, TRESCH e-mailed Demars with the information Demars should include in certain invoices he submitted to the Victim Firm. Those e-mails included the work that was purportedly done by NS Mater, as well as the purported amount that NS Mater was owed for that work. The e-mails provided a general description of the work claimed to be done but did not identify the employees who personally performed the work. TRESCH chose the amount of money that NS Mater was purportedly owed for the work based on how much money TRESCH wanted to receive. TRESCH knew that none of the work, was being done and the invoices were false. Demars in turn submitted the invoices to TRESCH via e-mail at the Victim Firm. The invoices Demars submitted contained much of the same information TRESCH had provided to him.

TRESCH submitted each invoice from Demars to the Victim Firm for payment. Because the Victim Firm had not authorized NS Mater to do the work that was being billed, TRESCH attempted to conceal the bills and avoid detection by spreading them out among various cost centers set aside for particular IT projects at the firm. With each invoice, TRESCH billed cost centers that TRESCH knew had money available to pay the invoices. The false representations in the invoice were material to the Victim Firm's decision to pay the invoices. The Victim Firm paid each invoice upon TRESCH's request, except for the final invoice TRESCH submitted on June 4, 2012. The Victim Firm mailed the checks for NS Mater to Demars. TRESCH never told the Victim Firm that TRESCH accepted

kickbacks for the NS Mater invoices, and TRESCH knew that information was material to the Victim Firm.

Between late 2010 and May 2012, the Victim Firm paid NS Mater approximately $1,112,000 for work that TRESCH and Demars falsely claimed that NS Mater contract employees performed at the firm. Between December 2010 and May 2012, Demars paid TRESCH approximately $976,250 via checks drawn on NS Mater's account at Itasca Bank. TRESCH understood that money was his share of the profits from the false invoices TRESCH directed Demars to submit to TRESCH. Sometimes, Demars left the checks for TRESCH in the mailbox at TRESCH's home in Itasca. Other times, TRESCH picked up the checks directly from Demars. TRESCH deposited the checks from NS Mater into the joint account TRESCH shared with his wife at Itasca Bank and in a Discover Financial account in TRESCH's name.

In July 2011, while TRESCH was in the midst of carrying out the scheme, the Victim Firm promoted TRESCH to the position of Chief Information Officer. In that role, TRESCH was responsible for overseeing all IT functions for the firm. Between late May 2012 and early June 2012, Victim Firm Employee A and Victim Firm Employee D spoke with TRESCH about their discovery that the Victim Firm was continuing to pay NS Mater. TRESCH downplayed the concerns of Victim Firm Employees A and D and promised to look into the matter further. On June 4, 2012, after speaking with Victim Firm Employees A and D, TRESCH e-mailed Demars and asked him to submit another false invoice for work

that NS Mater contract employees had purportedly done. Later that same day, Demars sent TRESCH the requested invoice by e-mail at the Victim Firm. Shortly after receiving the invoice from Demars, TRESCH submitted it to the Victim Firm for payment. TRESCH asked Demars for and submitted the false invoice on June 4, 2012, in an effort to perpetuate the scheme.

On June 28, 2012, the Victim Firm fired TRESCH. From November 2010 until the day of his firing, TRESCH understood that he owed a duty of honest services to the Victim Firm. TRESCH further understood that the kickback scheme with Demars was a violation of that duty.

On or about May 12, 2011, in the Northern District of Illinois, Eastern Division, TRESCH, for the purpose of executing the scheme to defraud, and attempting to do so, knowingly caused to be delivered by mail according to the direction thereon to NS Mater, PO Box 464, Itasca, IL, 60143, a check dated May 2, 2011, in the amount of $48,000 for work that TRESCH and Demars falsely represented was performed at the Victim Firm, in violation of Title 18, United States Code, Sections 1341 and 1346.

8.     The foregoing facts are set forth solely to assist the Court in determining whether a factual basis exists for defendant's plea of guilty and criminal forfeiture, and are not intended to be a complete or comprehensive statement of all the facts within defendant's personal knowledge regarding the charged crimes and related conduct.

## Maximum Statutory Penalties

9.     Defendant understands that the charge to which he is pleading guilty carries the following statutory penalties:

a.     Count One carries a maximum sentence of 20 years' imprisonment. Count One also carries a maximum fine of $250,000, or twice the gross gain or gross loss resulting from that offense, whichever is greater. Defendant further understands that with respect to Count One the judge also may impose a term of supervised release of not more than three years.

b.     Defendant further understands that the Court must order restitution to the victims of the offense in an amount determined by the Court.

c.     In accord with Title 18, United States Code, Section 3013, defendant will be assessed $100 on the count to which he has pled guilty, in addition to any other penalty or restitution  imposed.

## Sentencing Guidelines Calculations

10.     Defendant understands that in imposing sentence the Court will be guided by the United States Sentencing Guidelines. Defendant understands that the Sentencing Guidelines are advisory, not mandatory, but that the Court must consider the Guidelines in determining a reasonable sentence.

11.     For purposes of calculating the Sentencing Guidelines, the parties agree on the following points:

a.     **Applicable Guidelines**. The Sentencing Guidelines to be considered in this case are those in effect at the time of sentencing. The following statements regarding the calculation of the Sentencing Guidelines are based on the Guidelines Manual currently in effect, namely the November 2012 Guidelines Manual.

b.     **Offense Level Calculations.**

i.     Count One and defendant's relevant conduct are grouped under Guideline § 3D1.2(d).

ii.     The base offense level for the offenses of conviction is 8, pursuant to Guideline § 2B4.1(a).

iii.     The improper benefit to be conferred by the kickbacks was approximately $4,819,253.     Therefore, pursuant to Guideline §§ 2B4.1(b)(1) and 2B1.1(b)(1)(J), the offense level is increased by 18.

iv.     Defendant abused a position of private trust in a manner that significantly facilitated the commission and concealment of the offenses.     Therefore, pursuant to Guideline § 3B1.3, the offense level is increased by 2.

v.     Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if defendant continues to

accept responsibility for his actions within the meaning of Guideline § 3E1.1(a), including by furnishing the United States Attorney's Office and the Probation Office with all requested financial information relevant to his ability to satisfy any fine or restitution that may be imposed in this case, a two-level reduction in the offense level is appropriate.

vi.    In accord with Guideline § 3E1.1(b), defendant has timely notified the government of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. Therefore, as provided by Guideline § 3E1.1(b), if the Court determines the offense level to be 16 or greater prior to determining that defendant is entitled to a two-level reduction for acceptance of responsibility, the government will move for an additional one-level reduction in the offense level.

c.    **Criminal History Category**. With regard to determining defendant's criminal history points and criminal history category, based on the facts now known to the government, defendant's criminal history points equal zero and defendant's criminal history category is I.

d.    **Anticipated Advisory Sentencing Guidelines Range**. Therefore, based on the facts now known to the government, the anticipated offense level is 25, which, when combined with the anticipated criminal history category of I, results in an anticipated advisory Sentencing Guidelines range of 57 to 71 months' imprisonment, in addition to any supervised release, fine, and restitution the Court may impose.

e.     Defendant and his attorney and the government acknowledge that the above Guideline calculations are preliminary in nature, and are non-binding predictions upon which neither party is entitled to rely. Defendant understands that further review of the facts or applicable legal principles may lead the government to conclude that different or additional Guideline provisions apply in this case. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final Guideline calculation. Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations, and defendant shall not have a right to withdraw his plea on the basis of the Court's rejection of these calculations.

f.     Both parties expressly acknowledge that this Agreement is not governed by Fed.R.Crim.P. 11(c)(1)(B), and that errors in applying or interpreting any of the Sentencing Guidelines may be corrected by either party prior to sentencing. The parties may correct these errors either by stipulation or by a statement to the Probation Office or the Court, setting forth the disagreement regarding the applicable provisions of the Guidelines. The validity of this Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw his plea, nor the government the right to vacate this Agreement, on the basis of such corrections.

## Cooperation

12.    Defendant agrees he will fully and truthfully cooperate in any matter in which he is called upon to cooperate by a representative of the United States Attorney's Office for the Northern District of Illinois. This cooperation shall include providing complete and truthful information in any investigation and pre-trial preparation and complete and truthful testimony in any criminal, civil, or administrative proceeding. Defendant agrees to the postponement of his sentencing until after the conclusion of his cooperation.

## Agreements Relating to Sentencing

13.    At the time of sentencing, the government shall make known to the sentencing judge the extent of defendant's cooperation. If the government determines that defendant has continued to provide full and truthful cooperation as required by this Agreement, then the government shall move the Court, pursuant to Guideline § 5K1.1, to depart downward from the low end of the applicable Guideline range, and shall recommend a sentence that includes a term of imprisonment in the custody of the Bureau of Prisons of 66 percent of the low end of the applicable Guideline range. Defendant shall be free to recommend any sentence. Defendant understands that the decision to depart from the applicable guidelines range rests solely with the Court.

14.    If the government does not move the Court, pursuant to Sentencing Guideline § 5K1.1, to depart from the applicable Guideline range, as set forth above, the preceding paragraph of this Agreement will be inoperative, both parties shall be free to recommend any

sentence, and the Court shall impose a sentence taking into consideration the factors set forth in 18 U.S.C. § 3553(a) as well as the Sentencing Guidelines without any downward departure for cooperation pursuant to § 5K1.1. Defendant may not withdraw his plea of guilty because the government has failed to make a motion pursuant to Sentencing Guideline § 5K1.1.

15.    It is understood by the parties that the sentencing judge is neither a party to nor bound by this Agreement and may impose a sentence up to the maximum penalties as set forth above. Defendant further acknowledges that if the Court does not accept the sentencing recommendation of the parties, defendant will have no right to withdraw his guilty plea.

16.    Regarding restitution, defendant acknowledges that the total amount of restitution owed to the Victim Firm is $1,112,000, minus any credit for funds repaid prior to sentencing, and that pursuant to Title 18, United States Code, § 3663A, the Court must order defendant, together with any jointly liable co-defendant, to make full restitution in the amount outstanding at the time of sentencing.

17.    Restitution shall be due immediately, and paid pursuant to a schedule to be set by the Court at sentencing. Defendant acknowledges that pursuant to Title 18, United States Code, Section 3664(k), he is required to notify the Court and the United States Attorney's Office of any material change in economic circumstances that might affect his ability to pay restitution.

18.     Defendant agrees to pay the special assessment of $200 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

19.     Defendant agrees that the United States may enforce collection of any fine or restitution imposed in this case pursuant to Title 18, United States Code, Sections 3572, 3613, and 3664(m), notwithstanding any payment schedule set by the Court.

20.     After sentence has been imposed on the count to which defendant pleads guilty as agreed herein, the government will move to dismiss the remaining counts of the indictment as to defendant.

### Forfeiture

21.     The indictment charges that defendant is liable to the United States for approximately $4,819,253.69, which funds are subject to forfeiture because those funds constitute proceeds of the violation alleged in Count One.  Further, defendant has subjected real and personal property to forfeiture, namely, because that property was acquired with the proceeds of the violations alleged in Count One.  By entry of a guilty plea to Count One of the indictment, defendant acknowledges that the following property is subject to forfeiture:

a.      2011 Coleman Niagra RV Camping Trailer VIN: 4CG633H10B7227300;

b.      2009 Chevrolet K1500 Suburban LT VIN: 1GNFK26359J121770;

c.      2011 Cadillac DTS Premium VIN: 1G6KH5E66BU128432;

19

d.    2012 Chevrolet Extended Express G3500 Passenger VIN: 1GAZG1FG7C1103369;

e.    $203,623.49 seized from Discover online account ending in x4693;

f.    $26,547.79 seized from Itasca Bank account ending in x3702;

g.    the real property commonly known as 801 East North Street, Itasca, Illinois, and legally described as:

> ALL THAT CERTAIN PARCEL OF LAND SITUATED IN CITY OF ITASCA, DUPAGE COUNTY, STATE OF ILLINOIS, BEING KNOWN AND DESIGNATED AS LOT 10 AND LOT 11 (EXCEPT THE EAST 50 FEET OF SAID LOT 11) IN CLOVERS COUNTRY CLUB ADDITION TO ITASCA, BEING A SUBDIVISION OF PART OF THE NORTHEAST QUARTER OF SECTION 8, TOWNSHIP 40 NORTH, RANGE 11, EAST OF THE THIRD PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT THEREOF RECORDED FEBRUARY 6, 1925, AS DOCUMENT 188141, IN DUPAGE COUNTY, ILLINOIS.

> PIN: 03-08-201-018;

22.    Defendant agrees to the entry of a forfeiture judgment in the amount of $4,819,253.69, and against the property identified above, in that this property is subject to forfeiture. Prior to sentencing, defendant agrees to the entry of a preliminary order of forfeiture relinquishing any right of ownership he has in the above-described funds and property and further agrees to the seizure of these funds and property so that these funds and property may be disposed of according to law.

23.     Defendant understands that forfeiture of property generally is not treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon defendant in addition to the forfeiture judgment.  In this case, however, the United States Attorney's Office will recommend to the Attorney General that any net proceeds derived from any forfeited assets be remitted or restored to eligible victims of the offense pursuant to Title 18, United States Code, Section 981(e), Title 28, Code of Federal Regulations, Part 9, and other applicable law.

24.     Defendant further acknowledges that on or about October 15, 2012, administrative forfeiture proceedings were commenced against the following property:

a.     2011 Coleman Niagra RV Camping Trailer VIN: 4CG633H10B7227300;

b.     2009 Chevrolet K1500 Suburban LT  VIN:  1GNFK26359J121770;

c.     2011 Cadillac DTS Premium  VIN:  1G6KH5E66BU128432;

d.     2012 Chevrolet Extended Express G3500 Passenger VIN: 1GAZG1FG7C1103369;

e.     $203,623.49 seized from Discover online account ending in  x4693;

f.     $26,547.79 seized from Itasca Bank account ending in x3702;

Defendant relinquishes all right, title, and interest he may have in this property and understands that declarations of forfeiture have been or will be entered, extinguishing any claim he may have had in the seized property.

## Acknowledgments and Waivers Regarding Plea of Guilty

### Nature of Agreement

25.     This Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 12 CR 658.

26.     This Agreement concerns criminal liability only. Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver, or release by the United States or any of its agencies of any administrative or judicial civil claim, demand, or cause of action it may have against defendant or any other person or entity. The obligations of this Agreement are limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities, except as expressly set forth in this Agreement.

## Waiver of Rights

27.    Defendant understands that by pleading guilty he surrenders certain rights, including the following:

a.    **Trial rights**. Defendant has the right to persist in a plea of not guilty to the charges against him, and if he does, he would have the right to a public and speedy trial.

i.    The trial could be either a jury trial or a trial by the judge sitting without a jury. However, in order that the trial be conducted by the judge sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

ii.    If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random. Defendant and his attorney would participate in choosing the jury by requesting that the Court remove prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

iii.    If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant guilty beyond a reasonable doubt, and that the jury could not convict him unless, after hearing all the evidence, it was persuaded of his guilt beyond a reasonable doubt and that it was to consider each count of the indictment separately. The jury would have to agree

unanimously as to each count before it could return a verdict of guilty or not guilty as to that count.

iv.     If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering each count separately, whether or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

v.     At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them.

vi.     At a trial, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

vii.     At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

viii.     With respect to forfeiture, defendant understands that if the case were tried before a jury, he would have a right to retain the jury to determine whether the

government had established the requisite nexus between defendant's offense and any specific property alleged to be subject to forfeiture.

      b.     **Waiver of appellate and collateral rights**. Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial. Defendant is aware that Title 28, United States Code, Section 1291, and Title 18, United States Code, Section 3742, afford a defendant the right to appeal his conviction and the sentence imposed. Acknowledging this, if the government makes a motion at sentencing for a downward departure pursuant to Sentencing Guideline § 5K1.1, defendant knowingly waives the right to appeal his conviction, any pre-trial rulings by the Court, and any part of the sentence (or the manner in which that sentence was determined), including any term of imprisonment and fine within the maximums provided by law, and including any order of restitution or forfeiture, in exchange for the concessions made by the United States in this Agreement. In addition, if the government makes a motion at sentencing for a downward departure pursuant to Sentencing Guideline § 5K1.1, defendant also waives his right to challenge his conviction and sentence, and the manner in which the sentence was determined, and (in any case in which the term of imprisonment and fine are within the maximums provided by statute) his attorney's alleged failure or refusal to file a notice of appeal, in any collateral attack or future challenge, including but not limited to a motion brought under Title 28, United States Code, Section 2255. The waiver in this paragraph does not apply to a claim of involuntariness, or ineffective assistance of counsel,

which relates directly to this waiver or to its negotiation, nor does it prohibit defendant from seeking a reduction of sentence based directly on a change in the law that is applicable to defendant and that, prior to the filing of defendant's request for relief, has been expressly made retroactive by an Act of Congress, the Supreme Court, or the United States Sentencing Commission.

c.     Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraphs. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights.

### Presentence Investigation Report/Post-Sentence Supervision

28.     Defendant understands that the United States Attorney's Office in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing shall fully apprise the District Court and the Probation Office of the nature, scope, and extent of defendant's conduct regarding the charges against him, and related matters. The government will make known all matters in aggravation and mitigation relevant to sentencing, including the nature and extent of defendant's cooperation.

29.     Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the Probation Office, and the United States Attorney's Office regarding all details of his financial circumstances, including his recent income tax returns as specified by the probation officer. Defendant understands that providing false or incomplete information, or

refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to Guideline § 3E1.1 and enhancement of his sentence for obstruction of justice under Guideline § 3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001 or as a contempt of the Court.

30.    For the purpose of monitoring defendant's compliance with his obligations to pay a fine and restitution during any term of supervised release or probation to which defendant is sentenced, defendant further consents to the disclosure by the IRS to the Probation Office and the United States Attorney's Office of defendant's individual income tax returns (together with extensions, correspondence, and other tax information) filed subsequent to defendant's sentencing, to and including the final year of any period of supervised release or probation to which defendant is sentenced. Defendant also agrees that a certified copy of this Agreement shall be sufficient evidence of defendant's request to the IRS to disclose the returns and return information, as provided for in Title 26, United States Code, Section 6103(b).

## Other Terms

31.    Defendant agrees to cooperate with the United States Attorney's Office in collecting any unpaid fine and restitution for which defendant is liable, including providing financial statements and supporting records as requested by the United States Attorney's Office.

## Conclusion

32.     Defendant understands that this Agreement will be filed with the Court, will become a matter of public record, and may be disclosed to any person.

33.     Defendant understands that his compliance with each part of this Agreement extends throughout the period of his sentence, and failure to abide by any term of the Agreement is a violation of the Agreement. Defendant further understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or may move to resentence defendant or require defendant's specific performance of this Agreement. Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Agreement, or defendant breaches any of its terms and the government elects to void the Agreement and prosecute defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

34.     Should the judge refuse to accept defendant's plea of guilty, this Agreement shall become null and void and neither party will be bound to it.

35. Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement, to cause defendant to plead guilty.

36. Defendant acknowledges that he has read this Agreement and carefully reviewed each provision with his attorney. Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.


AGREED THIS DATE: _____4/22/13_____


_____
GARY S. SHAPIRO
United States Attorney

_____
DAVID TRESCH
Defendant


_____
TERRA REYNOLDS
Assistant U.S. Attorney

_____
JEFFREY B. STEINBACK
Attorney for Defendant