UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**F I L E D**
6 5 13
JUN 0 5 2013

Judge Edmond E. Chang
United States District Court

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 12 CR 658-2 |
| vs. | ) | |
| | ) | Judge Edmond E. Chang |
| NICHOLAS DEMARS | ) | |

## PLEA AGREEMENT

1.     This Plea Agreement between the United States Attorney for the Northern District of Illinois, GARY S. SHAPIRO, and defendant NICHOLAS DEMARS, and his attorney, ELLIOTT SAMUELS, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure and is governed in part by Rule 11(c)(1)(A), as more fully set forth below. The parties to this Agreement have agreed upon the following:

### Charges in This Case

2.     The indictment in this case charges defendant with: having devised and participated in a scheme to defraud and deprive the Victim Firm of the intangible right to the honest services of its employee, co-defendant David Tresch, through kickbacks, in violation of Title 18, United States Code, Sections 1341 and 1346 (Counts One through Five); and having devised and participated in a scheme to defraud and deprive the Victim Firm of the intangible right to the honest services of its employee co-defendant Tresch, through kickbacks, and to defraud and obtain money from the Victim Firm by means of materially false and fraudulent pretenses, representations, and promises, and the concealment of

material facts, in violation of Title 18, United States Code, Sections 1341 and 1346 (Counts Six through Ten).

3. Defendant has read the charges against him contained in the indictment, and those charges have been fully explained to him by his attorney.

4. Defendant fully understands the nature and elements of the crimes with which he has been charged.

## Charge to Which Defendant Is Pleading Guilty

5. By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to Count Six of the indictment, which charges defendant with having defrauded and deprived the Victim Firm of the intangible right to the honest services of its employee co-defendant Tresch, through kickbacks, and to defraud and obtain money from the Victim Firm by means of materially false and fraudulent pretenses, representations, and promises, and the concealment of material facts, in violation of Title 18, United States Code, Sections 1341 and 1346. In addition, as further provided below, defendant agrees to the entry of a forfeiture judgment.

## Factual Basis

6. Defendant will plead guilty because he is in fact guilty of the charge contained in Count Six of the indictment. In pleading guilty, defendant admits the following facts and that those facts establish his guilt beyond a reasonable doubt, and establish a basis for forfeiture of the property described elsewhere in this Plea Agreement:

2

Beginning no later than in or around November 2010 and continuing until on or about June 28, 2012, in the Northern District of Illinois, Eastern Division, and elsewhere, defendants NICHOLAS DEMARS and David Tresch knowingly devised and participated in a scheme to defraud and deprive the Victim Firm of the intangible right to the honest services of its employee, Tresch, through kickbacks, and to defraud and obtain money from the Victim Firm by means of materially false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

Specifically, in November 2010, DEMARS was the President of NS Mater, a firm that provided personnel and technology to businesses to assist in office automation, web and database development, and general IT matters. In 2003, DEMARS hired Tresch as a temporary contract employee at NS Mater. By the summer of 2004, DEMARS learned that the Victim Firm, a global law firm headquartered in Chicago, Illinois, hired Tresch to work in the Victim Firm's information technology department in Chicago. DEMARS understood that Tresch continued to work for the Victim Firm until June 28, 2012.

By late 2004, Tresch arranged for DEMARS to provide NS Mater contract employees to the Victim Firm. Between late 2004 and March 2011, NS Mater contract employees performed work on various projects related to information technology at the Victim Firm. During that time, DEMARS provided Tresch with kickbacks from NS Mater's work at the Victim Firm in exchange for Tresch steering work to NS Mater.

In the fall of 2010, Tresch told DEMARS that the Victim Firm would soon stop employing NS Mater contract employees. As a result, both DEMARS and Tresch would stop receiving money from the profits of the work of those employees. In October or November 2010, Tresch met with DEMARS to discuss another way they could continue to make money from the Victim Firm. During the meeting, Tresch told DEMARS to submit invoices from NS Mater to the Victim Firm. Tresch explained to DEMARS that he would tell DEMARS what information to put on the invoice, including the work that had been completed, and the amount of money owed to NS Mater for that work. Tresch told DEMARS that he should then submit the invoices to Tresch and that Tresch would submit them to the Victim Firm for payment. In exchange for his help, Tresch told DEMARS that Tresch would pay him $5,000 for each invoice. Tresch instructed DEMARS to write Tresch a check for the remainder of the paid invoice so that Tresch could use the money to hire other non-NS Mater contract employees. Tresch told DEMARS that those other contract employees would then perform the work DEMARS had claimed NS Mater contract employees had already performed. Tresch and DEMARS ultimately agreed to proceed with Tresch's idea.

Between November 2010 and early June 2012, Tresch e-mailed DEMARS with the information DEMARS should include in certain invoices he submitted to the Victim Firm. Those e-mails included the work that was purportedly done by NS Mater, as well as the purported amount that NS Mater was owed for that work. The e-mails provided a general description of the work claimed to be done but did not identify the employees who personally

4

performed the work. DEMARS submitted the invoices to Tresch via e-mail at the Victim Firm, knowing that the invoices were false. The invoices DEMARS submitted contained much of the same information Tresch had provided to him. The false representations in the invoice DEMARS submitted were material to the Victim Firm's decision to pay the invoices.

The Victim Firm paid each invoice upon Tresch's request, except for the final invoice Tresch submitted on June 4, 2012. The Victim Firm mailed the checks for NS Mater to DEMARS. DEMARS knew that Tresch had not told the Victim Firm that Tresch accepted kickbacks for the NS Mater invoices.

Between late 2010 and May 2012, the Victim Firm paid NS Mater approximately $1,112,000 for work that Tresch and DEMARS falsely claimed that NS Mater contract employees performed at the firm. Between December 2010 and May 2012, DEMARS retained $135,750 of the money the Victim Firm paid NS Mater. DEMARS considered the foregoing money to be DEMARS' share of the profits from the false invoices DEMARS submitted to Tresch. DEMARS used some of the $135,750 to make mortgage payments on his residence, located at 1367 Preswick Lane, Itasca, Illinois, and on a condominium, located at 211 E. Ohio, #2704, Chicago, Illinois.

Between December 2010 and May 2012, DEMARS paid Tresch approximately $976,250 via checks. DEMARS' checks to Tresch constituted Tresch's share of the profits from the false invoices DEMARS submitted to Tresch. Sometimes, DEMARS left the checks for Tresch in the mailbox at Tresch's home in Itasca. Other times, Tresch picked up

the checks directly from DEMARS. On or about June 28, 2012, Tresch told DEMARS that the Victim Firm fired Tresch over false NS Mater invoices DEMARS had submitted to the Victim Firm for payment. From November 2010 until the day of Tresch's firing, DEMARS understood that Tresch owed a duty of honest services to the Victim Firm. DEMARS further understood that the kickback scheme with Tresch was a violation of that duty.

On or about May 12, 2011, in the Northern District of Illinois, Eastern Division, Tresch and DEMARS, for the purpose of executing the scheme to defraud, and attempting to do so, knowingly caused to be delivered by mail according to the direction thereon to NS Mater, PO Box 464, Itasca, IL, 60143, a check dated May 2, 2011, in the amount of $48,000 for work that Tresch and DEMARS falsely represented was performed at the Victim Firm, in violation of Title 18, United States Code, Sections 1341 and 1346.

7.     Defendant also acknowledges that for the purpose of computing his sentence under the Sentencing Guidelines, the following conduct, to which he stipulates, constitutes relevant conduct under Guideline §1B1.3:

Beginning no later than in or around November 2004 and continuing until in or around March 2011, in the Northern District of Illinois, Eastern Division, and elsewhere, defendants DEMARS and Tresch knowingly devised and participated in a scheme to defraud and deprive the Victim Firm of the intangible right to the honest services of its employee, co-defendant Tresch, through kickbacks.

6

In the fall of 2004, Tresch talked to DEMARS about providing contract employees to install IT systems and advise Victim Firm employees on how to maintain and troubleshoot certain IT systems. Tresch talked to DEMARS about the Victim Firm's needs and whether NS Mater could fulfill them. DEMARS, on behalf of NS Mater, entered into an agreement with the Victim Firm.

Around the time that NS Mater contract employees began work at the Victim Firm, Tresch and DEMARS discussed how to split the profits DEMARS was earning from NS Mater's work at the Victim Firm. DEMARS asked Tresch if there was something DEMARS could do to ensure that the Victim Firm would continue to send work to NS Mater. DEMARS suggested that he and Tresch could split the profits from NS Mater's work with the Victim Firm 60/40, with 60% going to DEMARS and 40% going to Tresch. DEMARS explained that he was deserving of a 60% cut because he was responsible for the overhead expenses associated with running NS Mater. Tresch agreed to this arrangement. DEMARS understood that the money he would pay Tresch was a kickback, being paid in exchange for work Tresch had directed and would continue to direct from the Victim Firm to NS Mater. Tresch explained to DEMARS that he would need to charge the Victim Firm going-market rates for the work NS Mater contract employees performed in order to avoid drawing suspicion from the firm. Tresch told DEMARS the market rates for contract employees.

DEMARS used the market rates for contract employees when calculating the invoices for the work those employees performed at the Victim Firm. DEMARS submitted the

invoices for the work NS Mater contract employees performed at the Victim Firm to Tresch via e-mail at the Victim Firm. Tresch then submitted the invoices to the Victim Firm for payment. The Victim Firm paid each invoice upon Tresch's request. The Victim Firm mailed the checks for NS Mater to DEMARS. DEMARS deposited the checks for NS Mater into the NS Mater account at Itasca Bank.

Between late 2004 and July 2005, the Victim Firm paid NS Mater approximately $249,320 for the work NS Mater contract employees performed at the firm. After paying employees and payroll administrators, NS Mater's profits were approximately $110,145. Between February 2005 and July 2005, DEMARS paid Tresch approximately $49,900 as Tresch's share of the profits from the work NS Mater contract employees performed at the Victim Firm. DEMARS understood that Tresch did not disclose these payments to the Victim Firm. DEMARS retained the remaining NS Mater profits.

In late Spring 2005, the Victim Firm embarked on a project to consolidate data centers and to overhaul the Victim Firm's IT infrastructure. The project was expected to take two years starting in 2006, and would require the use of consulting companies and contract employees. Tresch directed some of the work under the project to NS Mater. By late 2005, Tresch discussed the scope of the project with DEMARS. Tresch told DEMARS that he wanted the profit split to change from 60/40 to 50/50. Tresch explained to DEMARS that such a split better reflected the risk Tresch was taking by giving the Victim Firm's business to DEMARS in exchange for a kickback. DEMARS agreed. Tresch also told DEMARS to

begin paying Tresch's wife Tresch's share of the kickbacks as if she were a salaried employee of NS Mater. DEMARS agreed.

In 2006 and 2007, DEMARS provided NS Mater contract employees to the Victim Firm to perform work on the Victim Firm's infrastructure project. In 2008, after the completion of the project, Tresch continued to direct work at the Victim Firm to NS Mater. Between 2008 and early 2011, DEMARS provided NS Mater contract employees to the Victim Firm to serve as temporary employees in the IT department. Between 2006 and March 2011, Tresch continued to have primary responsibility for overseeing the work that NS Mater contract employees performed for the Victim Firm. DEMARS submitted the invoices for the work NS Mater contract employees performed at the Victim Firm to Tresch via e-mail at the Victim Firm. The Victim Firm mailed the checks for NS Mater to DEMARS. DEMARS understood that Tresch never told the Victim Firm that Tresch accepted kickbacks from DEMARS for the work that NS Mater performed.

Between 2006 and March 2011, the Victim Firm paid NS Mater approximately $7,416,866 for the work NS Mater contract employees performed at the firm. After paying employees and payroll administrators, NS Mater's profits were approximately $3,597,108. Between 2006 and March 2011, DEMARS paid Tresch approximately $1,129,521 – Tresch's share of the profits of the kickback scheme – via checks made out to Tresch's wife drawn on the NS Mater account. During that time, Tresch's wife performed no work for NS Mater or the Victim Firm. DEMARS retained the remaining NS Mater profits, and used some of

the profits to make mortgage payments on his residence, located at 1367 Preswick Lane, Itasca, Illinois, and on a condominium, located at 211 E. Ohio, #2704, Chicago, Illinois.

DEMARS understood that as an employee of the Victim Firm, Tresch had a duty to provide honest services to the Victim Firm. DEMARS further understood throughout the kickback scheme with Tresch that the scheme was a violation of that duty. It was material to the Victim Firm to know whether Tresch accepted kickbacks in exchange for steering work to NS Mater. DEMARS knew that both he and Tresch concealed the kickbacks from the Victim Firm.

On or about March 7, 2008, in the Northern District of Illinois, Eastern Division, Tresch and DEMARS, for the purpose of executing the scheme to defraud, and attempting to do so, knowingly caused to be delivered by mail according to the direction thereon to NS Mater, PO Box 464, Itasca, IL, 60143, a check dated March 4, 2008, in the amount of $46,698.24 for work that NS Mater contract employees performed at the Victim Firm, in violation of Title 18, United States Code, Sections 1341 and 1346.

## Maximum Statutory Penalties

8.    Defendant understands that the charge to which he is pleading guilty carries the following statutory penalties:

a.    Count Six carries a maximum sentence of 20 years' imprisonment. Count Six also carries a maximum fine of $250,000, or twice the gross gain or gross loss resulting from that offense, whichever is greater. Defendant further understands that with

respect to Count Six the judge also may impose a term of supervised release of not more than three years.

b.    Defendant further understands that the Court must order restitution to the victims of the offense in an amount determined by the Court.

c.    In accord with Title 18, United States Code, Section 3013, defendant will be assessed $100 on the count to which he has pled guilty, in addition to any other penalty or restitution imposed.

### Sentencing Guidelines Calculations

9.    Defendant understands that in imposing sentence the Court will be guided by the United States Sentencing Guidelines. Defendant understands that the Sentencing Guidelines are advisory, not mandatory, but that the Court must consider the Guidelines in determining a reasonable sentence.

10.    For purposes of calculating the Sentencing Guidelines, the parties agree on the following points:

a.    **Applicable Guidelines**. The Sentencing Guidelines to be considered in this case are those in effect at the time of sentencing. The following statements regarding the calculation of the Sentencing Guidelines are based on the Guidelines Manual currently in effect, namely the November 2012 Guidelines Manual.

b.    **Offense Level Calculations.**

i.    Count Six and defendant's relevant conduct are grouped under Guideline § 3D1.2(d).

ii.    The base offense level for the offense of conviction is 8, pursuant to Guideline § 2B4.1(a).

iii.    The improper benefit to be conferred by the kickbacks was approximately $4,819,253. Therefore, pursuant to Guideline §§ 2B4.1(b)(1) and 2B1.1(b)(1)(J), the offense level is increased by 18.

iv.    Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if defendant continues to accept responsibility for his actions within the meaning of Guideline § 3E1.1(a), including by furnishing the United States Attorney's Office and the Probation Office with all requested financial information relevant to his ability to satisfy any fine or restitution that may be imposed in this case, a two-level reduction in the offense level is appropriate.

v.    In accord with Guideline § 3E1.1(b), defendant has timely notified the government of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. Therefore, as provided by Guideline § 3E1.1(b), if the Court determines the offense level to be 16 or greater prior to determining that defendant is entitled to a two-level

reduction for acceptance of responsibility, the government will move for an additional one-level reduction in the offense level.

      c.    **Criminal History Category**. With regard to determining defendant's criminal history points and criminal history category, based on the facts now known to the government, defendant's criminal history points equal zero and defendant's criminal history category is I.

      d.    **Anticipated Advisory Sentencing Guidelines Range**. Therefore, based on the facts now known to the government, the anticipated offense level is 23, which, when combined with the anticipated criminal history category of I, results in an anticipated advisory Sentencing Guidelines range of 46 to 57 months' imprisonment, in addition to any supervised release, fine, and restitution the Court may impose.

      e.    Defendant and his attorney and the government acknowledge that the above Guideline calculations are preliminary in nature, and are non-binding predictions upon which neither party is entitled to rely. Defendant understands that further review of the facts or applicable legal principles may lead the government to conclude that different or additional Guideline provisions apply in this case. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final Guideline calculation. Accordingly, the validity of this Agreement is not contingent upon the probation

officer's or the Court's concurrence with the above calculations, and defendant shall not have a right to withdraw his plea on the basis of the Court's rejection of these calculations.

f.    Both parties expressly acknowledge that this Agreement is not governed by Fed.R.Crim.P. 11(c)(1)(B), and that errors in applying or interpreting any of the Sentencing Guidelines may be corrected by either party prior to sentencing. The parties may correct these errors either by stipulation or by a statement to the Probation Office or the Court, setting forth the disagreement regarding the applicable provisions of the Guidelines. The validity of this Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw his plea, nor the government the right to vacate this Agreement, on the basis of such corrections.

## Agreements Relating to Sentencing

11.    Each party is free to recommend whatever sentence it deems appropriate.

12.    It is understood by the parties that the sentencing judge is neither a party to nor bound by this Agreement and may impose a sentence up to the maximum penalties as set forth above. Defendant further acknowledges that if the Court does not accept the sentencing recommendation of the parties, defendant will have no right to withdraw his guilty plea.

13.    Regarding restitution, defendant acknowledges that the total amount of restitution owed to the Victim Firm is $1,112,000, minus any credit for funds repaid prior to sentencing, and that pursuant to Title 18, United States Code, § 3663A, the Court must order

defendant, together with any jointly liable co-defendant, to make full restitution in the amount outstanding at the time of sentencing.

14.    Restitution shall be due immediately, and paid pursuant to a schedule to be set by the Court at sentencing. Defendant acknowledges that pursuant to Title 18, United States Code, Section 3664(k), he is required to notify the Court and the United States Attorney's Office of any material change in economic circumstances that might affect his ability to pay restitution.

15.    Defendant agrees to pay the special assessment of $100 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

16.    Defendant agrees that the United States may enforce collection of any fine or restitution imposed in this case pursuant to Title 18, United States Code, Sections 3572, 3613, and 3664(m), notwithstanding any payment schedule set by the Court.

17.    After sentence has been imposed on the count to which defendant pleads guilty as agreed herein, the government will move to dismiss the remaining counts of the indictment as to defendant.

### Forfeiture

18.    The indictment charges that defendant is liable to the United States for approximately $4,819,253.69, which funds are subject to forfeiture because those funds constitute proceeds of the violation alleged in Count Six. Further, defendant has subjected

real and personal property to forfeiture, namely, because that property was acquired with the

proceeds of the violations alleged in Count Six. It is the government's position that by entry

of a guilty plea to Count Six of the indictment, the following property is subject to forfeiture:

a. the real property commonly known as 211 East Ohio Street, Unit 2704,

Chicago, Illinois, and legally described as:

> PARCEL 1: UNIT 2704 TOGETHER WITH ITS UNDIVIDED
> PERCENTAGE INTEREST IN THE COMMON ELEMENTS
> IN GRAND OHIO CONDOMINIUM, AS DELINEATED
> AND DEFINED IN THE DECLARATION RECORDED AS
> DOCUMENT NUMBER 99613754, IN THE NORTH
> FRACTION OF SECTION 10, TOWNSHIP 39 NORTH,
> RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN,
> IN COOK COUNTY, ILLINOIS.
>
> PARCEL 2: EASEMENTS FOR THE BENEFIT OF PARCEL
> 1 FOR INGRESS, EGRESS, USE, SUPPORT AND
> ENJOYMENT AS SET FORTH IN THE DECLARATION OF
> COVENANTS, CONDITIONS, RESTRICTIONS, AND
> RECIPROCAL EASEMENTS RECORDED AS DOCUMENT
> NUMBER 99613753.
> PIN: 17-10-209-025-1507.

19. It is the government's position that the Court enter a forfeiture judgment in the

amount of $4,819,253.69, and against the property identified above, in that the property is

subject to forfeiture. Defendant disagrees, as a matter of law, regarding the amount of the

forfeiture judgement and whether the properties identified above should be included in the

forfeiture judgment. Defendant agrees that the Court and not a jury will determine the

amount of the forfeiture judgement and whether the properties identified above should be included in the forfeiture judgment.

20.     Defendant understands that forfeiture of property generally is not treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon defendant in addition to the forfeiture judgment. In this case, however, the United States Attorney's Office will recommend to the Attorney General that any net proceeds derived from any forfeited assets be remitted or restored to eligible victims of the offense pursuant to Title 18, United States Code, Section 981(e), Title 28, Code of Federal Regulations, Part 9, and other applicable law.

## Acknowledgments and Waivers Regarding Plea of Guilty

### Nature of Agreement

21.     This Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 12 CR 658-2.

22.     This Agreement concerns criminal liability only. Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver, or release by the United States or any of its agencies of any administrative or judicial civil claim, demand, or cause of action it may have against defendant or any other person or entity. The obligations of this Agreement are limited to the United States Attorney's Office for the Northern District

of Illinois and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities, except as expressly set forth in this Agreement.

## Waiver of Rights

23. Defendant understands that by pleading guilty he surrenders certain rights, including the following:

    a. **Trial rights**. Defendant has the right to persist in a plea of not guilty to the charges against him, and if he does, he would have the right to a public and speedy trial.

    i. The trial could be either a jury trial or a trial by the judge sitting without a jury. However, in order that the trial be conducted by the judge sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

    ii. If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random. Defendant and his attorney would participate in choosing the jury by requesting that the Court remove prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

    iii. If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant guilty beyond a reasonable doubt, and that the jury could not convict him unless, after

hearing all the evidence, it was persuaded of his guilt beyond a reasonable doubt and that it was to consider each count of the indictment separately. The jury would have to agree unanimously as to each count before it could return a verdict of guilty or not guilty as to that count.

  iv. If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering each count separately, whether or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

  v. At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them.

  vi. At a trial, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

  vii. At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

viii.    With respect to forfeiture, defendant understands that if the case were tried before a jury, he would have a right to retain the jury to determine whether the government had established the requisite nexus between defendant's offense and any specific property alleged to be subject to forfeiture.

b.    **Appellate rights.** Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial, and may only appeal the validity of this plea of guilty and the sentence imposed. Defendant understands that any appeal must be filed within 14 calendar days of the entry of the judgment of conviction.

c.    Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraphs, with the exception of the appellate rights specifically preserved above. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights.

### Presentence Investigation Report/Post-Sentence Supervision

24.    Defendant understands that the United States Attorney's Office in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing shall fully apprise the District Court and the Probation Office of the nature, scope, and extent of defendant's conduct regarding the charges against him, and related matters. The government will make known all matters in aggravation and mitigation relevant to sentencing, including the nature and extent of defendant's cooperation.

25.     Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the Probation Office, and the United States Attorney's Office regarding all details of his financial circumstances, including his recent income tax returns as specified by the probation officer. Defendant understands that providing false or incomplete information, or refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to Guideline § 3E1.1 and enhancement of his sentence for obstruction of justice under Guideline § 3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001 or as a contempt of the Court.

26.     For the purpose of monitoring defendant's compliance with his obligations to pay a fine and restitution during any term of supervised release or probation to which defendant is sentenced, defendant further consents to the disclosure by the IRS to the Probation Office and the United States Attorney's Office of defendant's individual income tax returns (together with extensions, correspondence, and other tax information) filed subsequent to defendant's sentencing, to and including the final year of any period of supervised release or probation to which defendant is sentenced. Defendant also agrees that a certified copy of this Agreement shall be sufficient evidence of defendant's request to the IRS to disclose the returns and return information, as provided for in Title 26, United States Code, Section 6103(b).

## Other Terms

27.     Defendant agrees to cooperate with the United States Attorney's Office in collecting any unpaid fine and restitution for which defendant is liable, including providing financial statements and supporting records as requested by the United States Attorney's Office.

## Conclusion

28.     Defendant understands that this Agreement will be filed with the Court, will become a matter of public record, and may be disclosed to any person.

29.     Defendant understands that his compliance with each part of this Agreement extends throughout the period of his sentence, and failure to abide by any term of the Agreement is a violation of the Agreement. Defendant further understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or may move to resentence defendant or require defendant's specific performance of this Agreement. Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Agreement, or defendant breaches any of its terms and the government elects to void the Agreement and prosecute defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against defendant in

accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

30.     Should the judge refuse to accept defendant's plea of guilty, this Agreement shall become null and void and neither party will be bound to it.

31.     Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement, to cause defendant to plead guilty.

32.     Defendant acknowledges that he has read this Agreement and carefully reviewed each provision with his attorney.  Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.


AGREED THIS DATE: _____


_____
GARY S. SHAPIRO
United States Attorney

_____
NICHOLAS DEMARS
Defendant


_____
TERRA REYNOLDS
Assistant U.S. Attorney

_____
ELLIOTT SAMUELS
Attorney for Defendant